668 F.2d 122
 In the Matter of the Requested Extradition of Desmond MACKIN
by the Government of the United Kingdom of Great
Britain and Northern Ireland.
UNITED STATES of America, Petitioner-Appellant
v.
Desmond MACKIN, Respondent-Appellee
Desmond MACKIN, Petitioner,
v.
George V. GRANT, United States Marshal for the Southern
District of New York, Respondent.
 Nos. 424, 335 and 290, Dockets 81-1324, 81-3064 and 81-3070.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 30, 1981.
Decided Dec. 23, 1981.
 
 Thomas H. Belote, Sp. Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. S. D. N. Y., Mark F. Pomerantz and Robert S. Litt, Asst. U. S. Attys., New York City, of counsel), for petitioner-appellant, the United States.
 Keara M. O'Dempsey, New York City (Beldock, Levine & Hoffman, and Frank Durkan, O'Dwyer & Bernstien, James Gilroy, James P. Cullen, Sheila Donohue, The Brehon Law Society, New York City, of counsel), for respondent-appellee, Desmond Mackin.
 Before FEINBERG, Chief Judge, and FRIENDLY and PIERCE, Circuit Judges.*
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal by the United States and an alternative request by it for mandamus consolidated therewith[1] relate to a decision of United States Magistrate Naomi Reice Buchwald (the Magistrate) of the District Court for the Southern District of New York dated August 13, 1981. The decision denied a request by the Government of the United Kingdom of Great Britain and Northern Ireland for the extradition of Desmond Mackin pursuant to Article VIII of the Extradition Treaty (sometimes hereafter the Extradition Treaty or the Treaty) between the United States and the United Kingdom. The Treaty, which is the successor to the very limited provision in Article 27 of Jay's Treaty, 8 Stat. 116, 129 (1794), and Article X of the Webster-Ashburton Treaty of 1842, 8 Stat. 572, 576-77, was signed on June 8, 1972 and entered into force on January 21, 1977, 28 U.S.T. 227, T.I.A.S. 8468. After the request had been submitted to the United States through diplomatic channels, a Special Assistant United States Attorney for the Southern District of New York, acting for and on behalf of the United Kingdom, filed an appropriate complaint in the District Court for the Southern District of New York pursuant to 18 U.S.C. § 3184.[2] Mackin was arrested under authority of an order of a district judge under that statute and has been held in custody since then. The complaint was referred to the Magistrate by a judge of the District Court for the Southern District of New York pursuant to Rule 9 of that court's Magistrates Rules.
 
 
 2
 The requested extradition was based upon Mackin's indictment in Northern Ireland on charges of attempted murder, on March 16, 1978, of a British soldier, Stephen Wooton, in Anderson stown, Belfast, Northern Ireland; wounding Wooton with intent to do grievous bodily harm, contrary to Section 18 of the Offenses Against the Person Act of 1861; and possession of firearms and ammunition with intent, in contravention of Section 14 of the Firearms Act (Northern Ireland) 1969. Mackin was arrested in Northern Ireland after the incident but was released on bail and failed to appear for trial there, entered the United States illegally and was apprehended by the Immigration and Naturalization Service.[3]
 
 
 3
 After taking extensive evidence, receiving briefs and hearing argument, the Magistrate delivered a lengthy and thorough opinion. She concluded that the United Kingdom had satisfied its burden, under Article IX(1) of the Treaty, of producing evidence "sufficient according to the law of the requested Party ... to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party ..." with respect to the first and third of the offenses charged.[4] However, the Magistrate declined to issue the certificate to the Secretary of State provided for by 18 U.S.C. § 3184 on the ground that the offenses charged came within Article V(1)(c)(i) of the Treaty, which states:
 
 
 4
 (1) Extradition shall not be granted if:
 
 
 5
 (c)(i) the offense for which extradition is requested is regarded by the requested Party as one of a political character ....
 
 
 6
 The Magistrate pointed to cases holding or indicating that the political offense exception is not limited to "purely" political offenses against a government, such as treason, sedition and espionage, but extends also to "relative" political offenses, to wit, crimes against persons or property which are incidental to a war, revolution, rebellion or political uprising at the time and site of the commission of the offense, see Ornelas v. Ruiz, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896); In re Castioni, (1891) 1 Q.B. 149 (1890); In re Meunier, (1894) 2 Q.B. 415 (1894); In re Ezeta, 62 F. 972, 977-1002 (N.D.Cal.1894); Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5 Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); Abu Eain v. Wilkes, 641 F.2d 504, 518-23 (7 Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). She found that: (1) at the time of the offenses charged against Mackin the Provisional Irish Republican Army (PIRA) was conducting a political uprising in the portion of Belfast where the offenses were committed; (2) that Mackin was an active member of PIRA; and (3) that the offenses committed against the British soldier were incidental to Mackin's role in the PIRA's political uprising in Belfast. Accordingly, she concluded that the crimes for which Mackin was indicted were "of a political character" within the meaning of Article V(1)(c)(i) of the Treaty.
 
 
 7
 As indicated above, the United States has appealed from the Magistrate's decision to deny the request of the United Kingdom, and in the alternative has sought mandamus to require her to grant the request. In addition to challenging the Magistrate's conclusion that Mackin's crime was "of a political character", the Government contends that decision whether an offense falls within Article V(1)(c)(i) is committed exclusively to the executive branch. Mackin contends that the Magistrate's order is not appealable because it is not a final decision of a district court of the United States within 28 U.S.C. § 1291 and that this court lacks power to issue a writ of mandamus under 28 U.S.C. § 1651 because of the requirement in that section that such issuance must be "necessary or appropriate in aid of ... (an issuing court's) jurisdiction( ) and agreeable to the usages and principles of law." If a contrary view should be taken on either of these points, Mackin contends that the applicability of Article V(1)(c)(i) is a question for the judicial branch and that the Magistrate's decision on the merits of that issue was correct.
 
 Appealability
 
 8
 Discussion of the appealability of orders granting or denying requests for extradition must go back as far as In re Metzqer, 46 U.S. (5 How.) 176, 12 L.Ed. 104 (1847)-a case decided just prior to enactment of the predecessor of the present extradition statute and which doubtless led to that statute's adoption, see notes 6 & 8, infra. Although the extradition treaty with France there at issue, 8 Stat. 580 (1848), unlike the Webster-Ashburton Treaty of the previous year with Great Britain, made no provision that the person whose extradition had been requested should be brought before a judge or magistrate "to the end that the evidence of criminality may be heard and considered", President Polk and Secretary of State Buchanan elected to submit the French Government's extradition request to Judge Betts of the District Court for the Southern District of New York, who, after a hearing, committed Metzger to custody to await the order of the President, see In re Metzger, 17 Fed.Cas. 232 (No. 9511) (D.C.S.D.N.Y.1847). Although the Supreme Court thought that in seeking a hearing before a judicial officer the executive had acted "very properly, as we suppose", 46 U.S. (5 How.) at 188-89, it concluded that the case "was heard and decided by the district judge at his chambers, and not in court" id. at 191. In that role the district judge was exercising "a special authority, and the law has made no provision for revision of his judgment. It cannot be brought before the District or Circuit Court; consequently it cannot, in the nature of an appeal, be brought before this court." Id. at 191-92. Since the Supreme Court thus had no appellate jurisdiction, under the most famous of constitutional decisions it likewise could not issue a writ of habeas corpus on Metzger's behalf. Thus the doctrine of the unappealability of extradition decisions by judges and magistrates was born.[5]
 
 
 9
 The prime purpose of the 1848 statute, 9 Stat. 302, which followed immediately on the Metzger decision, was to provide additional judicial officers to handle extradition requests.[6] Nothing on the face of the statute or in its legislative history shows an intention to alter the Supreme Court's ruling with respect to appealability.[7]
 
 
 10
 That question arose in In re Kaine, 55 U.S. (14 How.) 103, 120, 14 L.Ed. 345 (1852). Kaine was charged by the British Government with a murder in Ireland, apparently in a case having political overtones. Id. at 114-15. The request for extradition was made by the British Consul in New York and heard by a United States commissioner who ordered Kaine to be committed. The Circuit Court declined to issue habeas corpus, and Kaine sought to bring these rulings before the Supreme Court in a number of ways. Justice Curtis, concurring in a careful opinion, concluded that the Commissioner's action was unreviewable on appeal for the reason that, like the judge in Metzger and despite the 1848 statute, he was not exercising "any part of the judicial power of the United States", id. at 119; that the refusal of the Circuit Judge to issue a writ of habeas corpus could not be reviewed since it was not the cause of Kaine's commitment; and that the Supreme Court could not issue the writ on its own account since this would be a prohibited exercise of original jurisdiction.[8]
 
 
 11
 The decision in Kaine that the Act of August 12, 1848, was not intended to alter the holding in Metzger regarding the nonappealability of decisions granting extradition was recognized in a 1853 opinion of Attorney General Cushing to Secretary of State Marcy. The Attorney General stated, "Nor can appeal be taken from the decision of Mr. Justice Edmonds to any other court, so as to revise that decision. The judge or magistrate in this case acts by special authority under the act of Congress; no appeal is given from his decision by the act; and he does not exercise any part of what is, technically considered, the judicial power of the United States." 6 Op.Atty.Gen. 91, 96 (1853). Not long thereafter, the common understanding with respect to the appealability of orders denying extradition requests was reflected in another opinion rendered by the Office of the Attorney General to Secretary of State Seward in 1863, 10 Op.Atty.Gen. 501, 506. This stated unequivocally, in response to an objection by a foreign government to a district judge's denial of extradition,
 
 
 12
 In cases of this kind, the judge or magistrate acts under special authority conferred by treaties and acts of Congress; and though his action be in form and effect judicial, it is yet not an exercise of any part of what is technically considered the judicial power of the United States. No appeal from his decision is given by the law under which he acts, and therefore no right of appeal exists. (Ex-parte Metzger, 46 U.S. (5 How.), 176 (12 L.Ed. 104); U. S. v. Ferreira, 54 U.S. (13 How.), 40-48 (14 L.Ed. 42); in re Kane (sic), 55 U.S. (14 How.), 103, 119 (14 L.Ed. 345), Curtis J.) The decision of Judge Leavitt is thus beyond the reach of correction either by executive or judicial power.[9]
 
 
 13
 and suggested that the foreign government submit a new request. Further evidence of the nonappealability of orders granting extradition can be found in a Report of the Senate Judiciary Committee on the nation's extradition laws. S.Rep.No.82, 47th Cong., 1st Sess. (1882).
 
 
 14
 The Government suggests that the basis for the nonappealability of extradition orders was altered by the creation of the courts of appeals by the Act of March 3, 1891, 26 Stat. 826, since these courts are not subject to the constitutional limitations confining them to appellate jurisdiction which played a part in the Metzger decision and in Justice Curtis' opinion in Kaine. This, however, relates to the ability of the courts of appeals to exercise original jurisdiction over petitions for writs of habeas corpus, and not to the appealability of decisions under § 3184. It is thus not surprising that courts at every level have continued to state that decisions, even when made by district courts, denying or granting requests for extradition are not appealable under 28 U.S.C. § 1291. Collins v. Miller, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920); Caplan v. Vokes, 649 F.2d 1336, 1340 (9 Cir. 1981); Abu Eain v. Wilkes, 641 F.2d 504, 508 (7 Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); Antumes v. Vance, 640 F.2d 3, 4 n.3 (4 Cir. 1981); Matter of Assarsson, 635 F.2d 1237, 1240 (7 Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981); Gusikoff v. United States, 620 F.2d 459, 461 (5 Cir. 1980); Brauch v. Raiche, 618 F.2d 843, 847 (1 Cir. 1980); Hooker v. Klein, 573 F.2d 1360, 1364 (9 Cir.), cert. denied, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); Jhirad v. Ferrandina, 536 F.2d 478, 482 (2 Cir.), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); Greci v. Birknes, 527 F.2d 956, 958 (1 Cir. 1976); United States ex rel. Sakaguchi v. Kaulukukui, 520 F.2d 726, 729-30 (9 Cir. 1975); Shapiro v. Ferrandina, 478 F.2d 894, 901 (2 Cir.), cert. dismissed, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); Sayne v. Shipley, 418 F.2d 679, 685 (5 Cir. 1969), cert. denied, 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970); Wacker v. Bisson, 348 F.2d 602, 607 (5 Cir. 1965); Jimenez v. Aristeguieta, 290 F.2d 106, 107 (5 Cir. 1961). To quote from the most notable example, Justice Brandeis said in Collins v. Miller, supra, 252 U.S. at 369, 40 S.Ct. at 349, that "the proceeding before a committing magistrate in international extradition is not subject to correction by appeal".[10] Although none of the cases cited above squarely holds that an order denying a request for extradition is not appealable, these statements are not merely dicta, as the Government argues. Along with their statements as to the nonappealability of orders granting or denying extradition requests, courts have made clear that the extraditee in cases of grant and the requesting party in cases of denial have alternative, albeit less effective, avenues of relief. The extraditee may seek a writ of habeas corpus, the denial or grant of which is appealable, see note 8, supra, and the requesting party may refile the extradition request. Collins v. Loisel, 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923); Hooker v. Klein, supra, 573 F.2d at 1365-66; In re Gonzalez, 217 F.Supp. 717 (S.D.N.Y.1963); Ex parte Schorer, 195 F. 334 (E.D.Wis.1912). Both these remedies are inconsistent with the notion that the original orders were appealable. If the grant of a request were appealable, habeas corpus would not lie since that writ cannot be used as a substitute for an appeal. Stone v. Powell, 428 U.S. 465, 477, 96 S.Ct. 3037, 3044, 49 L.Ed.2d 1067 n.10 (1976); Sunal v. Large, 332 U.S. 174, 178-79, 67 S.Ct. 1588, 1590-91, 91 L.Ed. 1982 (1947). If denial of a request were appealable, a second request would ordinarily be defeated by the principle of res judicata. See Hooker v. Klein, supra, 573 F.2d at 1367-68.
 
 
 15
 Despite the Government's argument in this case, the general belief with respect to the unappealability of extradition orders has been very recently shared by the Department of Justice and the Department of State. On September 19, 1981, Senator Thurmond, along with several colleagues, introduced "a bill developed over the past 2 years in close cooperation with the Department of Justice and the Department of State to modernize the extradition laws of the United States." 127 Cong.Rec. S9952. Among many other features, the proposed Extradition Act of 1981 confines to the Attorney General the right to file a complaint charging that a person is extraditable to a foreign country, § 3192(a), provides that this may be done only in a United States district court, id., directs that the court certify to the Secretary of State its findings with respect to extraditability, § 3194(e), provides for appeals of such findings to the appropriate United States court of appeals, § 3195(a), and limits the extraditee's rights to seek review by other means, § 3195(c). Secretary of State Haig expressed the particular pleasure of the Department over several provisions of the bill, including one "which for the first time permit(s) appeal from a district court's decision on an extradition request (section 3195)", 127 Cong.Rec. S9953. A legal memorandum accompanying the proposed bill stated in unequivocal terms, 127 Cong.Rec. S9957:
 
 
 16
 Under present Federal law, there is no direct appeal from a judicial officer's finding in an extradition hearing. A person found extraditable may only seek collateral review of the finding, usually through an application for a writ of habeas corpus. The foreign government that is dissatisfied with the results of the hearing must institute a new request for extradition. The lack of direct appeal in extradition matters adds undesirable delay, expense, and complication to a process which should be simple and expeditious. (footnotes omitted)
 
 
 17
 At a hearing held on October 14, 1981, before the Senate Judiciary Committee, Michael Abbell, Director, Office of International Affairs, Criminal Division, Department of Justice, praised the bill because, among other things
 
 
 18
 It permits both a fugitive and the United States, on behalf of the requesting country, to directly appeal adverse decisions by an extradition court. Under present law a fugitive can only attack an adverse decision through habeas corpus, and the only option available to the United States, on behalf of a requesting country, is to refile the extradition complaint.
 
 
 19
 Daniel W. McGovern, Deputy Legal Adviser of the Department of State, said
 
 
 20
 Under present law there is no direct appeal from a judicial officer's finding in an extradition proceeding. A person found extraditable may only seek collateral review of the finding, usually through an application for a writ of habeas corpus. The foreign government that is dissatisfied with the results of the hearing must institute a new request for extradition. The lack of direct appeal in extradition matters adds undesirable delay, expense and complication to a process which should be simple and expeditious. Section 3195 (of the proposed bill) remedies this defect in current procedure by permitting either party in an extradition case to appeal directly to the appropriate United States court of appeals from a judge or magistrate's decision.
 
 
 21
 It is true, of course, that efforts by the Government to resolve an ambiguity in legislation in its favor should not preclude it from arguing, if the efforts have not yet succeeded, that the legislation should be construed in the manner which it asked Congress to make clear. Wong Yang Sung v. McGrath, 339 U.S. 33, 47, 70 S.Ct. 445, 452, 94 L.Ed. 616 (1950); United States v. Southwestern Cable Co., 392 U.S. 157, 169-70, 88 S.Ct. 1994, 2000-2001, 20 L.Ed.2d 1001 (1968); Sands, 2A Sutherland Statutory Construction § 49.10 at 261 (1973). But here the executive branch did not tell Congress that the law was uncertain and would benefit from clarification; it said flatly that the law was the exact opposite from what it contends in this case and that the law needed to be changed. Beyond this, and apart from the massive authority we have cited, what the Government told Congress was right and what it argues to us is wrong.
 
 
 22
 The only conceivable basis for appellate jurisdiction over orders granting or denying extradition is section 1291 to Title 28 which authorizes appeals to the courts of appeals from "final decisions of the district courts of the United States". In contrast, § 3184 proceedings are to be conducted by "any justice or judge of the United States, or any magistrate authorized so to do by courts of the United States or any judge of a court of record of general jurisdiction of any State". Decisions have noted the difference between § 3184's references to "judges", "justices", and "magistrates" and § 1291's reference to "district courts". Jimenez v. Aristeguieta, 290 F.2d 106, 107 (5 Cir. 1961); Shapiro v. Ferrandina, 478 F.2d 894, 901 (2 Cir.), cert. dismissed, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). Even when the decision to grant or deny is by a district judge, this still is not a decision of a district court within 28 U.S.C. § 1291. See Jimenez v. Aristeguieta, supra, 290 F.2d at 107. Although the distinction was criticized by the dissenting judge in that case, it goes back to the Supreme Court's 1847 decision in In re Metzger, supra, and we approved of it in Shapiro v. Ferrandina, supra, 478 F.2d at 901 & n.3. It is even clearer that the decision of a magistrate is not a final decision of a district court; when Congress has desired to permit an appeal from a decision of a magistrate directly to a court of appeals, it has said so. 28 U.S.C. § 636(c)(3). There is still greater difficulty in considering the decision of a state judge to be a final decision of a district court. Yet it would be curious if such decisions were nonappealable whereas the decision of a United States judge or magistrate was.[11]
 
 
 23
 There are similar problems in reading 28 U.S.C. § 1291 to include the decision of a judge of a court of appeals or a justice of the Supreme Court. It is instructive, in this regard, to examine the statutory provisions applicable to writs of habeas corpus, 28 U.S.C. §§ 2241-55. Section 2241 provides, inter alia, that writs of habeas corpus may be granted by "any circuit judge ". Evidently fearing that, without more, the action of a circuit judge would not be reviewable, Congress provided in § 2253 for an appeal from the decision of a circuit judge pursuant to § 2241: "In a habeas corpus proceeding before a circuit or district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit where the proceeding is had." Congress' failure to adopt a similar statutory provision with respect to an extradition order of a circuit judge under 18 U.S.C. § 3184 is evidence that it did not intend such a decision to be appealable to a court of appeals. Yet the Government has suggested no rational basis for a state of the law wherein an extradition decision of a United States district judge or magistrate would be appealable but that of a United States circuit judge would not be. When we add these considerations to the historical background of 18 U.S.C. § 3184 and the many decisions we have cited,[12] we think it clear that no appeal lies under 28 U.S.C. § 1291 from the Magistrate's decision here.[13]
 
 Mandamus
 
 24
 The Government's alternative petition for mandamus under 28 U.S.C. § 1651 encounters, as an initial obstacle, the argument that issuance of the writ is not "necessary or appropriate in aid"[14] of our jurisdiction since the Magistrate's decision is unappealable and we thus have no jurisdiction to aid. The Government replies, in part, that if we were to issue the writ and require the Magistrate to grant extradition, such a grant would almost certainly become the subject of a habeas corpus proceeding in the district court and its order in such a proceeding would be reviewable here under 28 U.S.C. § 2253. Compare Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932) (Supreme Court has power to grant mandamus requiring a district court to issue a bench warrant for the arrest of an indicted defendant since a conviction would be reviewable by a court of appeals and, on certiorari, by the Supreme Court.)
 
 
 25
 We have considered somewhat similar questions in United States v. Dooling, 2nd Cir., 406 F.2d 192, 197, cert. denied, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969) and United States v. Weinstein, 2nd Cir., 452 F.2d 704, 708-13 (1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). In Dooling we issued a writ to compel a district judge to sentence convicted defendants rather than to pursue a course, indicated by him, of dismissing the indictment upon grounds which were in part considered and rejected without leave to renew before trial by another district judge. We considered it not to be a fatal obstacle to issuance of the writ that the Government might not have been able to appeal if the judge had proceeded as he had intended, 406 F.2d at 198. In Weinstein we issued mandamus requiring a district judge to vacate an order dismissing an indictment after having entered a judgment of conviction although the Government could not have appealed under then existing law and the defendant obviously would not. We concluded "that the phrase 'in aid of their respective jurisdictions' should not be read so as to prohibit (the courts of appeals) ... from vacating orders, in actions generally subject to their supervision, that were beyond the power of the lower court to make, even though in the particular case there was no frustration of an appeal." 452 F.2d at 711. Quite recently the Third Circuit has upheld its power to issue a writ of mandamus to consider whether the District Court of the Virgin Islands lacked, as it thought, legal authority to convene an investigatory grand jury although no case arising from action of the putative grand jury was or, in the nature of things, could be before the court. United States v. Christian, 3rd Cir., 660 F.2d 892. We thus assume, at least arguendo, that mandamus could issue here if other tests with respect to that extraordinary remedy were met.[15]
 
 
 26
 We have discussed the standards governing issuance of the writ in a number of recent cases, e.g., American Express Warehousing, Ltd. v. Transamerica Insurance Co., 380 F.2d 277, 280-82 (2nd Cir. 1967); Investment Properties International, Ltd. v. IOS, Ltd., 459 F.2d 705, 707 (2nd Cir. 1972); Kaufman v. Edelstein, 539 F.2d 811, 816-19 (2nd Cir. 1976); National Super Spuds, Inc. v. New York Mercantile Exchange, 591 F.2d 174, 181 (2nd Cir. 1979); and In re Attorney General of the United States, 596 F.2d 58 (2nd Cir. 1979). While some of these cases granted the writ and others denied it, all the opinions agree that mandamus is reserved for "exceptional cases", whatever that may mean, and, more informatively, that "the touchstones are usurpation of power, clear abuse of discretion and the presence of an issue of first impression." American Express Warehousing, supra, 380 F.2d at 283.
 
 
 27
 The only issue here raised by the Government which might qualify under these standards is its claim that the Magistrate exceeded her jurisdiction by deciding whether the offenses for which Mackin's extradition was sought came within Article V(1)(c)(i) of the Treaty rather than deferring that decision to the executive branch. If she was correct in rejecting that contention, the case would not be appropriate for mandamus since there was nothing any more "extraordinary" in her decisions as to conditions in Northern Ireland in 1978 or as to the nexus between the offenses and what she found those conditions to be than there would be in any extradition case where the political offense exception was advanced[16] and, whether right or wrong, she clearly did not abuse her discretion in deciding as she did. We will now consider whether the Magistrate's decision of the jurisdictional issue was correct.
 
 
 28
 The Magistrate's jurisdiction to decide the political offense question
 
 
 29
 The Government's argument that the Magistrate had no jurisdiction to decide the political offense question begins with the language of the Treaty. Article V(1)(c)(i) speaks of an offense which "is regarded by the requested Party as one of a political character." As a matter of the ordinary meaning of language, "the requested Party" would seem in this case to be the Government of the United States, represented, as is uniformly true in matters of foreign relations, by the President, United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20, 57 S.Ct. 216, 220-21, 81 L.Ed. 255 (1936); L. Henkin, Foreign Affairs and the Constitution 45-50, 93 (1972), and not by a judicial officer. The Government asserts that this construction is reinforced by other provisions of the Treaty, notably Articles XIV(1) and XI(1), where it claims the term "requested Party" must mean the Government of the United States and not the courts.[17] It tells us further that the phrase "regarded by the requested Party as one of a political nature" represents a change from the language of older treaties and argues that by calling for the subjective opinion of the requested Party, the Treaty thus refers to the Secretary of State.
 
 
 30
 The Government's argument ignores the fact that the "new" language or an equivalent has been used in United States treaties at least since the turn of the century. The Extradition Treaty with Peru, 31 Stat. 1921 (1900), at issue in Garcia-Guillern v. United States, supra, 450 F.2d 1189, contained a provision stating "(i)f any question shall arise as to whether a case comes within ... (the political offense exception) the decision of the authorities of the government on which the demand for surrender is made ... shall be final." Identical language was contained in a 1901 treaty with Servia, 32 Stat. 1890, Art. VI. If anything, reference to the "authorities" of the United States Government is more suggestive of the executive branch than is the broader phrase, "requested Party", at issue in this case, thus undercutting the Government's theory that the "requested Party" language was intended to change existing law. Moreover, the phrase "requested Party" was used in the 1963 Extradition Treaty with Israel, 14 U.S.T. 1707, Art. VI(4), as to which the Seventh Circuit has rejected an argument by the Government similar to that here considered, see Abu Eain v. Wilkes, supra, 641 F.2d at 517. See also Extradition Treaty with Brazil, 15 U.S.T. 2093 (1961).
 
 
 31
 The Government's textual argument also ignores the existence of numerous treaties whose language explicitly envisions that courts will decide the political offense question. For example, a 1932 extradition treaty with Greece provides that "(t)he State applied to, or courts of such State, shall decide whether the crime or offense is of a political character", 47 Stat. 2185. See also Treaty Concerning the Mutual Extradition of Criminals with Czechoslovakia, 44 Stat. 2367 (1925); Treaty of Extradition with Albania, 49 Stat. 3313 (1935); Treaty for the Extradition of Fugitives from Justice with Austria, 46 Stat. 2779 (1930). The Government has suggested no reason, and we are unable to envision any, why courts should determine political offense questions under some treaties, but not under others. If the State Department had wanted to change the rule reflected in the above treaties and in the cases cited infra, it would hardly have done so on a piecemeal basis in treaties with individual foreign states and without disclosing its intention to the Senate.[18] Rather it would have adopted the more open and decisive approach of seeking legislation, as it is currently attempting to do, see p. 137, infra. It seems much more likely that the language was intended to preclude a foreign state from arguing that the United States was bound by a definition of political offense derived from international law or the law of the requesting state.
 
 
 32
 The Government seeks to buttress its textual argument with arguments of policy and analogy. It calls attention to decisions that determination whether a case falls within the exception provided by Article V(i)(c)(ii), to wit, that "the person sought proves that the request for his extradition has in fact been made with a view to try or punish him for an offense of a political character" lies solely with the executive branch. See In re Lincoln, 228 F. 70, 73-74 (E.D.N.Y.1915), aff'd per curiam, 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916); Garcia-Guillern v. United States, supra, 450 F.2d at 1192; In re Gonzalez, 217 F.Supp. 717, 722 (S.D.N.Y.1963). Recognizing the latter principle, the Seventh Circuit in Abu Eain, supra. 641 F.2d at 516-17, perceived no inconsistency between confiding to the courts a decision with respect to past facts and refusing to allow them to probe the motives of a requesting government-a conclusion with which we agree. The Government notes that a judicial decision on the political offense exception may cause difficulties in this country's foreign relations; such difficulties would exist also, indeed might be heightened, if decision were placed solely in the executive branch, unless the political offense exception were to be eviscerated in practice in the case of extradition treaties with nations with which we are allied or whose favor we especially desire. See also I. A. Shearer, Extradition in International Law 197-98 (1971). The Government relies on cases such as The Three Friends, 166 U.S. 1, 17 S.Ct. 495, 41 L.Ed. 897 (1897), and Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), holding that determination when a state of war or belligerency exists in a foreign country is solely for the executive; these are adequately distinguished in the Seventh Circuit's opinion in Abu Eain, 641 F.2d at 514 n.14. That court likewise sufficiently answered, id. at 514-15, the arguments made here by the Government, on the basis of United States v. Curtiss-Wright Export Corp., supra, and Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), as to the special ability of the executive branch to acquire the facts with respect to conditions in foreign countries.
 
 
 33
 Moreover, whatever we might decide if we were writing on a clean slate, the rock on which the Government's arguments shatter is the long-standing recognition that courts shall determine whether a particular offense comes within the political offense exception. This principle was in existence at least as long ago as when In re Kaine, supra, was decided in 1852. Four years after enactment of the Act of August 12, 1848, Justice Catron, speaking for four members of the Supreme Court, wrote that "extradition without an unbiased hearing before an independent judiciary ... (is) highly dangerous to liberty, and ought never to be allowed in this country", In re Kaine, supra, 55 U.S. (14 How.) at 113. Although this statement is directed at extradition proceedings in general and not specifically at the political offense issue, Justice Catron's opinion gives no indication that the political offense issue ought to be treated differently from other issues at the extradition hearing. More importantly, an example cited by Justice Catron, relating to the alleged mistreatment of one Jonathan Robbins, suggests that the members of the Court joining in his opinion were of the view that "an unbiased hearing before an independent judiciary" was particularly necessary in cases where the political offense exception is at issue.
 
 
 34
 In 1799 Jonathan Robbins (also variously referred to as Thomas Nash and Nathan Robbins) was surrendered by the United States to British naval officials, pursuant to Article 27 of Jay's Treaty. The British sought Robbins' extradition for a murder allegedly committed aboard a British naval vessel. Jay's Treaty contained no provision regarding the procedure to be followed in extradition cases, and at the time there was no legislation on the subject. Believing he had a relatively free hand, President Adams arranged the delivery of Robbins by instructing District Judge Bee of South Carolina to hand the extraditee over to the British. Adams' action caused an extraordinary national outcry. See, e.g., 10 Annals of Congress 580-640 (1800). As Professor Moore notes, "(t)he case created great excitement, and was one of the causes of the overthrow of John Adams' administration." 1 Moore, Extradition 550-51 (1922); see also In re Kaine, 55 U.S. (14 How.) at 111-12. The outcry against Adams' action seems to have arisen, in large part, from the widespread perception that Robbins was an American seaman who had been impressed into the British navy and that the murder for which he was charged had occurred either in the course of a mutiny or while fleeing from the British in an escape attempt. See Speech of John Marshall, 10 Annals of Congress 613 (1800), reprinted in, 18 U.S. at 5 Wheat, App. 201, 204-05, 215 (1820). Robbins' supporters apparently conceded that he had committed a murder, yet argued that a murder committed in fleeing from illegal impressment should not be extraditable.
 
 
 35
 Although the term "political offense" was not current at the time, and apparently was not used in the debates surrounding the Robbins case, 10 Annals of Congress 580-640 (1800), the argument made on Robbins' behalf bears many resemblances to the political offense doctrine. In both instances an otherwise extraditable crime is thought to be rendered nonextraditable by the circumstances surrounding its commission and by the motives of the criminal. Significantly, in later years the Robbins case came to be regarded as centering on the political offense question. As Justice Nelson wrote in Ex parte Kaine, 14 Fed.Cas. 78, 81 (No. 7597) (C.C.S.D.N.Y.) (1853), "It was the apprehension of the people of this country, at the time, that the offense of Jonathan Robbins, who was delivered up under the treaty with Great Britain of 1794, was a political offense...."
 
 
 36
 The circumstances of the Robbins case described above assume importance because, as Justice Catron noted in In re Kaine, supra, "(t)hat the eventful history of Robbins' case had a controlling influence on our distinguished negotiator (Daniel Webster), when the Treaty of 1842 was made; and especially on Congress, when it passed the Act of 1848, is, as I suppose, free from doubt." 55 U.S. (14 How.) at 112. With the Robbins case thus firmly in the legislature's mind, it is difficult to avoid the conclusion that when Congress charged commissioners and judges with determining whether evidence exists to "sustain (a) charge under the provisions of ... (a) treaty", 9 Stat. 302, sec. 1, it had no intention of silently excepting the political offense issue from the magistrates' consideration. Rather, the combination of the view that the Robbins case involved the political offense question, and the perception that extradition without judicial oversight was "highly dangerous to liberty and ought never to be allowed in this country", In re Kaine, supra, 55 U.S. (14 How.) at 113, strongly suggests that it was precisely the political offense question that was of the greatest concern to Congress in passing the Act of August 12, 1848. This view is buttressed by the references to the political offense issue in the debates on the act, see Cong. Globe, July 28, 1848 (remarks of Mr. King and Mr. Bedger).
 
 
 37
 We recognize that Justice Nelson's later opinion as a Circuit Judge in Ex parte Kaine, supra, 14 Fed.Cas. at 81, contained language suggesting that decisions concerning the political offense exception are solely for the executive branch. Justice Nelson wrote "the surrender, in such cases, involves a political question, which must be decided by the political, and not by the judicial, powers of the government. It is a general principle, as it respects political questions concerning foreign governments, that the judiciary follows the determination of the political power, which has charge of its foreign relations, and is, therefore, presumed to best understand what is fit and proper for the interest and honor of the country." We think Justice Nelson misunderstood the import of the Robbins incident, and that Justice Catron's view of the mistrust of exclusion of the judiciary from the extradition process is a far sounder interpretation of the views of the times. Moreover, this view is more consistent with the concern with individual liberties that formed the basis for Justice Nelson's dissenting opinion in In re Kaine, supra, 55 U.S. (14 How.) at 141-42, 147. If there is to be a change in this, the alteration should come from Congress.
 
 
 38
 The doctrine that decisions with respect to the political offense exception is for the courts was also recognized in In re Castioni, supra, (1891) 1 Q.B. 149, although, as the Government points out, there was no need to address the question there since the British Extradition Act of 1870 provided a defense to any person who could "prove to the satisfaction of the ... magistrate or the Court before whom he is brought on habeas corpus, or to the Secretary of State, that the requisition for his surrender has in fact been made with a view to try or punish him for an offense of a political character." 33 & 34 Vict., c. 52, § 3(1). In In re Ezeta, 62 F. 972 (N.D.Calif.1894), the court assumed that it had power to determine whether the offense was political. It evidently regarded this as part of its duty, imposed by 18 U.S.C. § 3184, to hear and consider the evidence of criminality and to determine whether there is evidence "to sustain the charge under the provisions of the treaty". In Ornelas v. Ruiz, 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896), the Supreme Court reversed a ruling by a district judge discharging, as a political offender, a person whom a magistrate had found not to be one; the Court expressed no disapproval at the magistrate's having decided the question, although saying, id. at 512, 16 S.Ct. at 692, that "(t)he contention that the right of the executive authority to determine what offenses charged are or are not purely political is exclusive is not involved in any degree." The principle that the judicial officers named in § 3184 are to determine whether or not the crime charged is a political offense has been sustained in a number of other reported cases, Jimenez v. Aristeguieta, 311 F.2d 547 (5 Cir. 1962), cert. denied, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963); Garcia-Guillern v. United States, 450 F.2d 1189 (5 Cir. 1962); Shapiro v. Ferrandina, 478 F.2d 894 (2 Cir.), cert. dismissed, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); Jhirad v. Ferrandina, 536 F.2d 478 (2 Cir.), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); Abu Eain v. Wilkes, 641 F.2d 504 (7 Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); In re Lincoln, 228 F. 70, 74 (S.D.N.Y.1915) (dicta); United States ex rel. Karadzole v. Artukovic, 170 F.Supp. 383 (S.D.Cal.1959); Ramos v. Diaz, 179 F.Supp. 459 (S.D.Fla.1959); In re Gonzalez, 217 F.Supp. 717 (S.D.N.Y.1963), although only Abu Eain and In re Lincoln contain discussion of the issues.
 
 
 39
 One reason for the lack of discussion is that the position that the judicial officers designated in § 3184 lack power to determine whether the offense was political is a new one for the executive branch. In 1908, a foreign ambassador wrote to the Secretary of State, proposing that a provision be included in the extradition treaty about to be entered into, whereby the political offense determination would be made by the courts of the requested country. In response, Secretary Elihu Root wrote:
 
 
 40
 According to the system of jurisprudence obtaining in the United States, the question as to whether or not an offense is a political one is always decided in the first instance by the judicial officer before whom the fugitive is brought for commitment to surrender. If the judicial authorities refuse to commit the fugitive for surrender on the ground that he is a political offender, or for any other reason, the matter is dead.... Bearing in mind, therefore that under our system of jurisprudence, it is not possible for any fugitive who claims to be a political offender to be extradited, it is hoped that your Government will be satisfied without insisting upon the insertion of an express stipulation providing that the question as to whether an offense is political shall be decided by the judicial authorities. (Emphasis added.)
 
 
 41
 Letter from Secretary of State Root, dated June 12, 1908; quoted in 4 G. Hackworth, Digest of International Law 46 (1942). In 1960 the Assistant Legal Adviser to the Department of State wrote a United States Attorney:
 
 
 42
 With regard to the assertion that Mylonas' extradition is being sought for acts connected with crimes or offenses of a political character, it should be noted that this is a matter for decision, initially, by the extradition magistrate on the basis of the evidence submitted to him. (Emphasis added.)
 
 
 43
 Letter of State Department Assistant Legal Advisor to U.S. Attorney, dated June 22, 1960, concerning In re Mylonas, 187 F.Supp. 716 (N.D.Ala.1960); cited in 6 M. Whiteman, Digest of International Law 842-853 (1968).[19] The view of the Department of Justice and the Department of State with respect to the existing law appears also in the materials recently presented to the Senate in connection with S. 1639, § 3194(a) of which would remove from the court's jurisdiction "to determine whether the foreign state is seeking the extradition of the person for a political offense, for an offense of a political character, or for the purpose of prosecuting or punishing the person for his political opinions." The Senate was told in the Legal Memorandum accompanying the bill, 127 Cong.Rec. S9956 (Sept. 18, 1981):
 
 
 44
 Under the present case law, the courts decide whether the crime for which extradition has been requested is a political offense...
 
 
 45
 citing in n.56 four of the cases cited above. An almost identical statement was made by Deputy Legal Adviser McGovern, p. 4.
 
 
 46
 It follows that, as the law now stands, both the judicial and the executive branches have recognized that, under § 3184, decision whether a case falls within the political offense exception is for the judicial officer. The Government cites us to no overriding principle which dictates a contrary result. The Court said in Baker v. Carr, 369 U.S. 186, 211, 212, 82 S.Ct. 691, 706, 707, 7 L.Ed.2d 663 (1962), that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance" and "a court can construe a treaty and may find it provides the answer." While the policy arguments made by the Government are not without force, particularly in an age of spreading terrorism, they are not so overwhelming as to justify us in concluding that the 1848 statute and its successors did not mean that the judicial officer should decide whether the offense for which extradition is sought is political. Whether the national interests would be better served by the position here advocated by the executive branch, which it has asked Congress to adopt in S. 1639, is for that body to determine. We therefore conclude that the Magistrate correctly sustained her own power to decide the political offense question and thus, for reasons heretofore explained, there is no basis for our issuing mandamus.
 
 Mackin's Habeas Corpus Petition
 
 47
 Immediately after the Magistrate's decision the Government refiled its extradition request before District Judge Sand in accordance with the procedure recognized in Hooker v. Klein, supra, 573 F.2d 1360, and applied for a new warrant of arrest. Believing that the question of appealability should be resolved before action by him the judge held this request in abeyance pending a request for a stay to the Magistrate. She granted such a stay pending application to this court for a stay pending expedited appeal, which this court granted. Before we granted the stay, Mackin filed a petition for habeas corpus with this court and a motion for immediate release. Since our stay of the Magistrate's decision will terminate upon the coming down of the mandate, unless the Government should request and we should see fit to grant an extension of the stay pending application for certiorari or the decision of the renewed application before Judge Sand[20], we must consider the petition for habeas corpus.
 
 
 48
 This need not detain us long. The statute, 28 U.S.C. § 2241, provides that writs of habeas corpus may be granted by "the Supreme Court, any justice thereof, the district courts, and any circuit judge within their respective jurisdictions." A court of appeals is conspicuously absent from this list. It has repeatedly been held that courts of appeals have no jurisdiction to entertain petitions such as Mackin's. Posey v. Dowd, 134 F.2d 613 (7 Cir. 1943); Jensen v. Teets, 219 F.2d 235 (9 Cir. 1955); Loum v. Alvis, 263 F.2d 836 (6 Cir. 1959); Parker v. Sigler, 419 F.2d 827 (8th Cir. 1969). See also FRAP 22(a) and accompanying Notes of Advisory Committee on Appellate Rules.
 
 
 49
 The Government's appeal is dismissed for lack of jurisdiction. Its alternative application for mandamus is entertained solely on the issue of the Magistrate's jurisdiction to rule on the political offense exception and is otherwise dismissed; the portion entertained is denied on the merits. Mackin's petition for habeas corpus is dismissed for want of jurisdiction. Mackin may recover his costs.
 
 
 
 *
 When this appeal was heard, Judge Pierce was a District Judge for the Southern District of New York, sitting by designation. He was inducted as a judge of this court on November 30, 1981
 
 
 [1]
 Also consolidated were a petition by Mackin to this court for a writ of habeas corpus and a motion for immediate release
 
 
 [2]
 This provides:
 Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge or a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.
 The statute goes back to the Act of August 12, 1848, 9 Stat. 302. It was continued as Rev.Stat. § 5270, appears as 18 U.S.C. § 651 (1940 ed.), and was codified in substantially its present form in 1948, 62 Stat. 822.
 
 
 [3]
 Although Mackin is also subject to detention by the INS pending deportation, he has consistently indicated his willingness to be deported to the Republic of Ireland and detention pending deportation would thus be brief
 
 
 [4]
 The Magistrate's opinion does not specify which of the offenses that Mackin is charged with are supported by probable cause, id. at 20-21. However, for the purposes of this appeal the parties are in agreement that the Magistrate found probable cause existed only as to the first and third offenses. Government Brief at 7 n.* ; Appellee's Brief at 5
 
 
 [5]
 Metzger turned out to have the last laugh, see Swisher, History of the Supreme Court-the Taney Period 1836-64, 179-80 (1974)
 
 
 [6]
 The principal purpose of the bill, as stated by Representative Ingersoll, was "to enlarge the facilities to comply with our obligations" under extradition treaties. "It often happened that an individual came to this country where the crime was obvious, and the application for the fugitive regular; but there were no such officers in the part of the country where the fugitive was found as were authorized or were willing to take on themselves the burden and the weighty responsibility of issuing a warrant to arrest and to take the preliminary proceedings toward handing over the individual to the properly authorized officer. The object of this bill was to appoint officers and to authorize others to carry out the provisions of the treaties with France and England, at all times without delay and the denial of justice. It provided for the appointment of commissioners, or authorized the courts of the United States to appoint commissioners to take the preliminary steps, and to procure the authority of the Secretary of State, to whom the treaties give authority to deliver up fugitives to foreign countries, for the accomplishment of the desired object." Cong. Globe, June 23, 1848
 
 
 [7]
 During the floor debates of the proposed extradition act Senator Dayton referred to the Supreme Court's decision in the Metzger case, but did not intimate that the bill would alter the result of that case. Cong. Globe, July 28, 1848
 
 
 [8]
 The majority, speaking through Justice Catron, was at pains to make clear that its refusal of habeas corpus was on the merits, 55 U.S. (14 How.) at 117-18, without deigning to answer the jurisdictional problems developed by Justice Curtis. However, the stress laid by the majority on the need for employing magistrates "to issue the warrant, cause the arrest and adjudge the criminality", particularly in the case of criminals fleeing from Canada and caught "in hot pursuit" without any need of transmission of an extradition request through diplomatic channels in Washington since otherwise "in the entire range of country, west of the Rocky mountains, and for more than five hundred miles on this side of it, throughout the great western plains, no arrests could be made, nor would they be attempted", suggests agreement with Justice Curtis that a magistrate's action under the 1848 statute was not within the judicial power of the United States
 Justice Nelson's lengthy dissent, joined by Chief Justice Taney and Justice Daniel, apparently predicated jurisdiction on the Circuit Court's refusal to issue a writ of habeas corpus; he thought that decision to be "a proper subject to review by this court, by virtue of the writ of habeas corpus." 55 U.S. (14 How.) at 148. On the merits he held that the request must be presented through diplomatic channels and that the Commissioner had no power to act because he had not been specially authorized to do so by a court of the United States.
 Again the extraditee had the last laugh. Justice Nelson, sitting as Circuit Judge, later ordered Kaine's release on the grounds, inter alia, that there had been insufficient evidence of Kaine's criminality. Ex parte Kaine, 14 Fed.Cas. 78 (No. 7597) (C.C.S.D.N.Y.1853).
 The Act of February 5, 1867, 14 Stat. 385, ultimately vindicated Justice Nelson's position on habeas corpus appealability by providing for an appeal from final decisions of the circuit courts on petitions for habeas corpus. See Benson v. MacMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234 (1888); In re Luis Oteiza y Cortes, 136 U.S. 330, 10 S.Ct. 1031, 34 L.Ed. 464 (1890).
 
 
 [9]
 In United States v. Ferreira, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1851), the Court had held that a United States District Judge, acting on a claim arising under the treaty with Spain for the cession of Florida, was not exercising the judicial power of the United States and that an appeal from his decision to the Supreme Court would not lie
 It is notable that the citation of In re Kaine, supra, in the Attorney General's opinions was to Justice Curtis' concurring opinion, which the Department of Justice evidently regarded as embodying the correct view. 6 Op.Atty.Gen. 91, 96; 10 Op.Atty.Gen. 501, 506.
 
 
 [10]
 Under English law, an extraditing magistrate's decision denying extradition has been held unappealable, Atkinson v. United States of America Government, (1971) AC 197 at 213, (1969) 3 ALL ER 1317, HL. Lord Reid was of the view that this was "settled law" reaching back to the early 19th century, id. at 1324
 
 
 [11]
 The Government suggested at argument that such a decision might be appealable through the hierarchy of state courts and would ultimately be reviewable by the Supreme Court under 28 U.S.C. § 1257. We find nothing in the long history of international extradition in the United States which suggests that Congress intended state courts to have a role beyond the initial commitment proceedings; the sparsity of federal judges and commissioners in 1847 doubtless made that limited resort necessary, see note 6, supra. The parties cited us no state court case dealing with extradition under § 3184, and our research has found none more recent than the mid-19th century. In saying this we are aware that in naturalization cases where 8 U.S.C. § 1421 vests jurisdiction in both the district courts and "all courts of record in any State or Territory", 8 U.S.C. § 1421, courts of appeals have routinely heard appeals from district court naturalization decisions, e.g., Jubran v. United States, 255 F.2d 81 (5 Cir. 1958); Taylor v. United States, 231 F.2d 856 (5 Cir. 1956); Hing Lowe v. United States, 230 F.2d 664 (9 Cir. 1956); Brukiewicz v. Savoretti, 211 F.2d 541 (5 Cir. 1954); Ralich v. United States, 185 F.2d 784 (8 Cir. 1950); Marcantonio v. United States, 185 F.2d 934 (4 Cir. 1950), whereas appeals from state court decisions proceed through the state systems. In re Ramadass, 445 Pa. 86, 284 A.2d 133 (1971) (and cases cited therein); In re Marque's Petition, 341 Mass. 715, 172 N.E.2d 262 (1961); Calo v. United States, 400 Ill. 329, 79 N.E.2d 619 (1948); In re Bogunovic, 18 Cal.2d 160, 114 P.2d 581 (1941). However, extradition has international aspects far more serious than naturalization. Moreover, the naturalization decisions occur in a statutory framework that differs in an important respect from that governing extradition. Section 1421 of Title 8 vests "the district courts" with jurisdiction over naturalization proceedings, and thus, there is little question but that § 1291-which permits appeal from "all " final decisions of the "district courts"-is applicable. In contrast, as noted above, § 3184 vests individual judges with jurisdiction over extradition requests
 
 
 [12]
 The Government relies heavily on the decision in Application of United States, 563 F.2d 637, 641 (4 Cir. 1977), upholding § 1291 jurisdiction over a district court's denial of an application under 18 U.S.C. § 2518 for interception of wire or oral communications, enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, which can be made to any "judge of competent jurisdiction", with successive applications also a possibility, § 2518(1)(e), as in the case of extradition. Such orders lack the long history of nonappealability of those in extradition proceedings. Consequently we have no occasion to consider whether the court was correct in finding § 1291 jurisdiction
 
 
 [13]
 The Magistrate suggested that an order upholding the political offense exception might be appealable whereas orders denying extradition for lack of sufficient evidence of probable cause were not, since the latter were akin to a preliminary hearing or a refusal of a grand jury to indict, in both of which circumstances the Government's remedy is to try again. In contrast, a ruling on the political offense exception is more like a judicial one applying law to the facts. We find nothing in the statutory language or the cases to support this distinction. Beyond this, if the Government were allowed to appeal the Magistrate's adverse finding with respect to the political offense exception, it would be hard to deny Mackin a cross-appeal from her finding of probable cause
 
 
 [14]
 The words "or appropriate" were added, apparently without explanation, in the revision of 1948. Compare Judiciary Act of 1789, § 13 & 14, 1 Stat. 80-82; Judicial Code of 1911, § 262, 36 Stat. 1162; and 28 U.S.C. § 1651. See 28 U.S.C. § 1651 Historical and Revision Notes
 
 
 [15]
 One reason for our assuming this only arguendo stems from our discussion with regard to appealability. If the Magistrate was not in fact exercising the judicial power of the United States, query whether a writ of mandamus can be issued to her by a court of appeals under 28 U.S.C. § 1651, contrast 28 U.S.C. § 1361
 
 
 [16]
 It is noteworthy that, despite the claims in the Government's brief, at 25-26, that a failure to obtain the extradition of Mackin would have "the potential for causing a significant interference in our relations with the United Kingdom", no affidavits from State Department or other Government officials attesting to this danger were submitted to the Magistrate, as was done in In re Attorney General, supra, 596 F.2d at 64 (affidavit of the Attorney General that "the failure to recognize the privilege would adversely affect the entire law enforcement and intelligence-gathering apparatus of the United States.")
 
 
 [17]
 Article XI(1) of the treaty provides that "(t)he requested Party shall promptly communicate to the requesting Party through the diplomatic channel the decision on the request for extradition." This provision hardly establishes that "requested Party" "can refer only to the Government (i.e., the State Department)", as the Government's brief asserts, p. 28. The term "requested Party" is most naturally interpreted as a reference to the government of the United States or Great Britain, as the case may be, without any intent to refer to a particular branch of those governments. The separate reference to "the diplomatic channel" would be unnecessary if "requested Party" did in fact mean the State Department
 Article XIV(1) of the treaty provides "(t)he requested Party shall make all necessary arrangements for and meet the cost of the representation of the requesting Party in any proceedings arising out of a request for extradition." It does this provision no violence to read it as fixing the international legal obligations of the United States and Great Britain without speaking to the manner in which each nation goes about meeting these obligations as a domestic matter.
 Against this Mackin argues that the Government's equation of "the requested Party" with the executive branch does not fit Article V(2) which provides that extradition may be refused on any ground specified by "the law of the requested Party". This same argument applies to the numerous references in the treaty to "the territory of the requested Party", e.g., Arts. VI, VII, VIII, and IX. Likewise, Article VII(5)(a) speaks of certification of arrest warrants by "a judge, magistrate or other competent authority of the requesting Party", a usage inconsistent with the notion that "requested Party" refers specifically to the executive branch.
 
 
 [18]
 As far as we are aware, following Justice Nelson's opinion in Ex parte Kaine, supra, the argument that the "requested party" language made the political offense decision solely for the executive branch was not made again until 1980 in Abu Eain, supra
 
 
 [19]
 The word "initially" refers to the fact that when the judicial officer on a habeas court decides that the offense is not political, the Secretary of State may still decline to order extradition. See Note, Executive Discretion in Extradition, 62 Colum.L.Rev. 1313, 1315 & cases cited in note 18 (1962); 1 Moore, Extradition 549-76 (1891); Hyde, International Law, 606-08 (1922)
 
 
 [20]
 Judge Sand should consider the renewed application on the record before the magistrate and such other relevant evidence as the United States or Mackin may introduce and give such weight to the Magistrate's conclusions as he deems appropriate. See Hooker v. Klein, supra, 573 F.2d at 1369-70 (concurring opinion of Judge Chambers)