**Josef PRUSHINOWSKI, Appellant,**

v.

**Fleury T. SAMPLES; Attorney General of the United States; Secretary of State of the United States, Appellees.**

No. 84–6108.

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1984.

Decided May 24, 1984.

David J. Butler, Washington, D.C. (Barry M. Heller, Brownstein, Zeidman & Schomer, Washington, D.C., Thomas C. Manning, Purser, Cheshire, Manning & Parker, Raleigh, N.C., William S. Kenney, Washington, D.C., on brief), for appellant.

Dennis I. Moore, Asst. U.S. Atty., Raleigh, N.C. (Samuel T. Currin, U.S. Atty., Raleigh, N.C., Leonie M. Brinkema, Falls Church, Va., Patricia C. Gunn, U.S. Dept. of Justice, Washington, D.C., Office of Intern. Affairs, on brief), for appellees.

Before RUSSELL, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Josef Prushinowski is a citizen both of the United States of America and of Israel. He subscribes to the religious tenets of the Chassidic sect which abides by strict dietary restrictions.

Prushinowski operated a business in Great Britain through two corporations. The British Valued Added Tax applies at many if not all of the stages by which a commodity finds its way to market. Consequently, upon transfers of property, a commercial enterprise, such as that conducted by Prushinowski, may become entitled to refunds or credits. Prushinowski, it is asserted, applied a scheme by which he claimed and received such tax benefits for

sales which had not, in fact, taken place. He did so despite warnings from an employee not to do so.

Prushinowski returned to the United States and thereafter faced efforts by the United States Government, acting at the request of the government of Great Britain, to extradite him to England to answer criminal charges of theft. The United States District Court for the Eastern District of North Carolina found that Prushinowski met the requirements for extradition, so certified, and ordered Prushinowski committed.

■ Prushinowski, in his pursuit of a writ of *habeas corpus*, first contends that the offenses with which he is charged are truly violations of the English Finance Act of 1972 and not the Theft Act of 1968. The law of England seems clear that offenses under the former are not grounds for extradition under the treaty between the United States and Great Britain, while, on the other hand, violations of the Theft Act are. *See Regina v. Governor of Pentonville Prison, Ex Parte Khubchandani*, 71 Crim.App. 241, 248 (1980). It seems to us that the offenses charged may well constitute violations of both statutes. There is no necessary mutual exclusivity. The arguments which can be made that the British Theft Act has been violated by the actions of Prushinowski are sufficiently strong to cause us to defer judgment to a tribunal much better qualified than we to rule on a matter of British law, namely, the appropriate British court. Assuming, therefore, that the United Kingdom has demonstrated probable cause to believe that Prushinowski has violated the Theft Act, extradition is proper regardless of whether his acts amount to violations of the Finance Act as well.

■ We come then to Prushinowski's second contention, that the United Kingdom did not meet its burden of proof in establishing probable cause. Our standard of reviewing a probable cause determination is an exceedingly narrow one:

It is not a means for rehearing what the magistrate already has decided. The al-

leged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, *by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.*

*Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (emphasis added); *see also Peroff v. Hylton*, 542 F.2d 1247 (4th Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977).

■ In light of the applicable standard of review, we affirm the district court's conclusion that the United Kingdom has demonstrated probable cause. That thefts have occurred has been persuasively indicated. It is not our function to afford a trial on the merits, and, again, we defer to a tribunal far better qualified than we to assess the merits of Prushinowski's defenses. That Prushinowski may be able to assert a strong defense and avoid being convicted in no way implies that extradition is improper.

The final contention of Prushinowski revolves around a questionable fact which the district judge, presumably in an effort to streamline matters, accepted as proven for purposes of the case. Prushinowski's assertion is that in any British prison in which he might find himself he would be unable to obtain any food complying with his rules regulating dietary restrictions, and, consequently, would starve to death.

■ As a matter of strict interpretation, the district judge may have been justified in making the assumption he did and still holding that no adequate grounds to defeat the extradition had been made out. It is established that constitutional questions of deprivation of rights are addressed only to the acts of the United States Government and not to those of a foreign nation, at least for purposes of determining questions of extraditability. *Plaster v. United States*, 720 F.2d 340, 349 n. 9 (4th Cir.1983),

*citing Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901).

Seldom, however, can a principle of law be carried to absolute extremes without developing fissures. It is unlikely that extradition would be ordered if the facts were established, by assumption for purposes of argument, or by convincing proof, that the prisons of a foreign country regularly opened each day's proceedings with a hundred lashes applied to the back of each prisoner who did not deny his or her God or conducted routine breakings on the wheel for every prisoner.

However, in those extreme cases, the dire consequences foreseen by anyone being subjected to extradition to the country involved would be solely consequences of the actions by others. The extraditee would not participate in any way in bringing them about. To the contrary, if starvation should indeed occur in Prushinowski's case because of a religious determination not to eat nourishing and healthful, but "unclean" (in a religious sense) food, he

would be a principal, indeed a primary, participant in the bringing about of the dire circumstances.

▪ There are substantial numbers of Chassidic Jews resident in Great Britain. They live subject to that country's laws and face the prospect of imprisonment in the event of violation of those laws. Prushinowski makes no contention that another Chassidic Jew would be dealt with any differently by the British authorities than he has concluded he himself would be treated. No information has been brought to the court's attention of any substantial problem of prisoners, especially those awaiting trial, being subject to application of prison policy in such a way as to force them to starve themselves. The attenuated theory on which Prushinowski's case rests is simply too insubstantial, too farfetched, to withstand, in and of itself, the light of day.[1]

Accordingly, the judgment of the district court is

AFFIRMED.[2]

---

1. In light of our disposition of this issue, we have no occasion to pursue our skepticism regarding the accuracy of the assumption that Prushinowski's extradition will lead to his death. We note in passing, however, that the policy in Great Britain is that "[a]rrangements are made where necessary for prisoners to comply, within reason, with the tenets of their faith in matters of dress and diet [footnote omitted]." 37 *Halsbury's Laws of England* ¶ 1160 (Lord Hailsham of St. Marylebone 4th ed. 1982). Our awareness of that policy, combined with our understanding that substantial numbers of Chassidic Jews reside in Great Britain, and our lack of knowledge of other instances in which Chassidic Jews have been forced to starve themselves, lead to an enhancement of our skepticism.

Nonetheless, we understand fully the pressures of expediency, the need to avoid "much ado about nothing," which no doubt induced the district court to adopt the assumption. Furthermore, the very manner in which Prushinowski's counsel has pursued the matter removes any lingering concern that the issue deserves more attention. At the district court level, Prushinowski's counsel sought to prove the very fact that the district court ultimately assumed. Despite the district court's assumption of all that counsel had hoped to prove, counsel nonetheless saw fit to argue to this court that a remand was necessary because the district court had deprived counsel of the opportunity to develop a

record. Our willingness to decide the case in light of the district court's assumption relieves us of the need to question whether the very illogic of counsel's position would be enough to sustain a conclusion that his primary concern is to delay, and that the merits of his argument accordingly deserve no more attention.

2. We see no reason, in a case so easy to dispose of on less exotic grounds, which would justify our considering the possibility that, by treaty, Congress may participate in abrogation of so fundamental a right as the free exercise of religion. *Cf. Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

Indeed, it is far more reasonable to assume that the United States government, if the problem Prushinowski has, somewhat hypothetically, posed were actual, rather than altogether theoretical, would have taken steps by moderation of the extradition treaty, or in an extreme case by abrogation, to correct it. The State Department, after all, not the courts, is the agency primarily charged with responsibility in the area, yet we have been presented not the slightest indication that a threat of starvation of Chassidic Jews confined in prisons of Great Britain has ever arisen, much less ripened into fruition. It is, we should not forget, the State Department that initiated the extradition proceedings, an unlikely occurrence were the threat articulated by Prushinowski real.