the denial of any specific request for discovery.

In the Matter of the EXTRADITION
OF Sukhminder SINGH
a/k/a "Sukhi".

In the Matter of the EXTRADITION
OF Ranjit Singh GILL
a/k/a "Kukki".

Magistrate Nos. 87–6160G–01,
87–6161G–01.

United States District Court,
D. New Jersey.

Nov. 2, 1987.

See also, D.C., 123 F.R.D. 108, D.C., 123 F.R.D. 140.

Judy G. Russell, Sp. Asst. U.S. Atty., Fleming, Merrill, Roth & Russell, Newark, N.J., for plaintiff.

William M. Kunstler, Ronald L. Kuby, New York City, for defendants.

## OPINION AND ORDER

RONALD J. HEDGES, United States Magistrate.

### INTRODUCTION

During a July 10, 1987 telephone conference defendants' counsel advised that they intended to offer evidence "as to the inability of the defendant[s] to receive a fair trial in India." See Transcript of July 10, 1987 telephone conference at p. 3, 11. 1–5. Pursuant to Letter–Order filed September 1, 1987, the Court advised the parties that the question whether such evidence would be admissible at an extradition hearing would be decided prior to any such hearing and directed defendants to submit a brief.

In response thereto, William M. Kunstler, Esq., counsel for defendant Ranjit Singh Gill, corresponded with the Court by letter dated September 8, 1987. Mr. Kunstler advised that defendants intended to introduce evidence that they "face torture and/or murder upon their return to India," and suggested that any ruling on admissibility would be premature. Pursuant to Letter–Order filed September 15, 1987, the Court confirmed that it would address admissibility prior to the hearing. Oral argument was conducted on October 26, 1987.

### DISCUSSION

Defendants' position is summarized as follows:

Respondents have been asked to address whether evidence of their inability to receive a fair trial in India is properly admissible at the extradition hearing. This formulation is too narrow a statement of that evidence which, given the unique and grave circumstances of this

proceeding, the respondents intend to submit.

At the time of hearing, respondents will be prepared to present evidence that upon their extradition to India, they would be subject to procedures and punishment antipathetic to a federal court's sense of decency.

Respondents do not contend merely that they would be unable to receive a 'fair trial.' The procedures which obtain under Indian laws do not deprive them merely of a fair trial but instead go far beyond that to deprive them of basic human rights. As to their treatment should they be returned, the magistrate acknowledges that respondents contend that they will be subject to torture and/or murder. [Defendants' Memorandum of Law at 1].

Having criticized the procedure set by the Court, defendants address evidence submitted in support of their position:

Given the manner in which respondents here have been ordered to proceed, correct resolution of the instant issue cannot be had apart from the most careful attention to the context in which respondents' claims of rudely deficient procedures and shockingly brutal treatment arise. The affidavit herewith submitted on behalf of the respondents, drawn and sworn to by the Honorable Ajit Singh Bains, a former justice, now retired, of the Punjab and Haryana High Court, details systematic patterns of arbitrary torture of those in custody, the laying of false charges, and the summary execution of those in custody in false 'encounters' staged by the police. His affidavit also details that respondents have already once been the unhappy objects of unwelcome police interest in them, having been the victims of trumped-up charges based on police allegations of participation in a criminal conspiracy subsequently found to have been wholly spurious.

In ruling on whether respondents shall be permitted to present evidence at hearing that, if returned, they would be subject to procedures and treatment antipathetic to a federal court's sense of decency, the affidavit of Justice Bains cannot be read in isolation and then rejected as uncorroborated. The affidavit is in no sense uncorroborated. Its annexures stand as independent corroboration and offer further and distressing documentation of the systematic torture of prisoners by police, as well as of the systematic and ruthless elimination of prisoners by police.

Further, in keeping with *Arnbjorns-dottir*, expressly cited in the letter-order of September 15, 1987, the requesting government's human rights record must be considered when ruling on whether evidence on the points in question is to be admissible. Unlike Iceland, India's is not 'outstanding.' Responsible human rights organizations, both without and within India, have voiced concern as to procedures which, although incompatible with international human rights standards, obtain under Indian law. The shockingly brutal treatment of prisoners, many unjustifiably detained, has also claimed the attention of human rights organizations.

Amnesty International consistently expresses concerns regarding human rights abuses in India in its annual reports. Further, in December 1986, it issued a special document focusing on several hundred Sikh detainees from the Punjab, held now for more than two years without trial on the basis of identical 'cyclostyled' confessions drawn by the police and replete with identical admissions ostensibly made by each detainee. The 1986 special document discusses also the systematic laying of false charges by the police, the killing by police of innocent persons in staged 'false encounters,' and the existence of special laws which are 'particularly relevant to the detention and trial of political prisoners from the Punjab' and which are fundamentally incompatible with international human rights standards.

Domestic human rights organizations have also chronicled the shocking conditions which exist in India today relative both to the corruption of the rule of law and as to disregard for the most funda-

mental human rights. Citizens for Democracy, a human rights organization based in New Delhi, produced in 1985 a document entitled Report to the Nation: Oppression in Punjab (hereinafter Report to the Nation).

The report is a numbing chronicle. In its own words:

> The Report has gathered that in the name of curbing terrorism unabashed state terrorism has been unleased on the Sikhs branding them as criminals, arbitrary arrests and McCarthy style witch-hunt, sadistic torture of Amritdhari Sikhs and cold-blooded shooting down of young men in false encounters are common occurrences[.]

Report to the Nation, p. 9. The report details, inter alia, murder and assault of Sikhs, the regular practice of torture, atrocities on children, and consistent violation of the rule of law—all under color of official authority.

Deaths of Sikhs while in the custody of the police and army are documented. As backdrop to respondents' claims, we here reference the report's treatment merely of one, which involves the Ludhiana police. Both respondents are from Ludhiana. The CFD fact-finding team offered the following verbatim account, secured during the course of their investigation:

> The police took away my husband on 11.11.84 giving no reason for arrest, not saying where he was being taken. On 13.11.84 Ludhiana Police came to tell me that my husband was very ill and I should go with them. Reaching there I found he was dead, both his arms were broken, there were many injuries on the testicles, the legs had been stretched to such an extent that the body had got torn and his intestines had come out. The body had fallen apart. . . .

Report to the Nation, p. 29.

Such is the context in which respondents raise their claim that they will be prepared to present at hearing evidence which will establish that if returned to India, they will be subject to procedures and treatment antipathetic to a federal court's sense of decency. As we show in the Argument section, *infra,* resolution of this profound issue cannot properly be had without consideration of the evidence itself. The procedure here to be employed, however, in effect severs respondents' claims from the evidence on which they rest. Respondents' claims of torture and death are real, however, and nothing can make them less so. Peremptory [*sic*] refusal to consider them will but taint these proceedings irrevocably. [Defendants' Memorandum of Law 3–7 (footnotes omitted)].

Whether such evidence is admissible at an extradition hearing requires the Court to discuss the extradition process itself.

In *In re United States,* 713 F.2d 105 (5th Cir.1983), the court described the process of international extradition:

> The substantive right of a foreign country to request the return of a fugitive and the duty of the United States to deliver the fugitive depends entirely on the existence of a treaty between the requesting nation and the United States. 18 U.S.C. § 3181 (1976), *Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 193, 78 L.Ed. 315 (1933). To invoke its right to extradite a fugitive, the requesting nation must submit its request to a state or federal court. 18 U.S.C. § 3184 (1976). The court determines whether the fugitive is subject to extradition and, if so, must order the fugitive's commitment and certify the supporting record to the Secretary of State. *Id. The decision to surrender the fugitive then rests in the discretion of the Secretary of State. 18 U.S.C. § 3186 (1976); Escobedo v. United States,* 623 F.2d 1098, 1105 n. 20 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980). [713 F.2d at 107–08 (emphasis added) (footnote omitted)].

As the Fifth Circuit Court of Appeals held in *Escobedo v. United States,* 623 F.2d 1098 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980), "[t]he ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its power to conduct foreign affairs." 623 F.2d at 1105.

Accord *Quinn v. Robinson,* 783 F.2d 776, 789–90 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *Demjanjuk v. Petrovsky,* 776 F.2d 571, 584 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Plaster v. United States,* 720 F.2d 340, 349 (4th Cir.1983); *Peroff v. Hylton,* 563 F.2d 1099, 1102–03 (4th Cir.1977) (*per curiam*); *In re Extradition of Pazienza,* 619 F.Supp. 611, 621 (S.D.N.Y.1985). Consistent with the foregoing, the Ninth Circuit Court of Appeals recognized in *Quinn v. Robinson, supra,* that

> it is clear that the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime ... or to refuse extradition on humanitarian grounds because of the procedures of treatment that await a surrendered fugitive.... [783 F.2d at 789–90].

An early decision which addressed whether a particular question should be reserved for decision by the Secretary is *In re Lincoln,* 228 F. 70 (E.D.N.Y.1915), *aff'd per curiam,* 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916). In *Lincoln,* the accused had requested "leave to prove that, even extradited upon a criminal charge and tried therefor, the prosecution would be animated by the endeavor to make him endure punishment from political motives...." 228 F. at 74. The District Court rejected the accused's application:

> It does not seem that this question can be disposed of or should be disposed of by the court. The application for extradition is made to the government of the United States through the Department of State. The warrant of extradition must actually be executed by the Department of State, until the prisoner is delivered to the proper officer of the demanding government. The court is concerned solely with the question of the charge of crime, and that crime, as has been said, must be one known as a crime in the place where the hearing was held. If it be shown that the acts charged as crime indicate a *political* offense, and not a

*criminal* one, as known to the jurisdiction holding the hearing, then certainly the court could not find that there was probable cause as to the commission of a crime. This would involve considering whether the offense as charged is political or criminal.

> But *it is not a part of the court proceedings nor of the hearing upon the charge of crime to exercise discretion as to whether the criminal charge is a cloak for political action, nor whether the request is made in good faith.* Such matter should be left to the Department of State. The government of the United States, through the Secretary of State, should determine whether the foreign government is in fact able to exercise its civil powers, and whether diplomatic and treaty relations are being carried out and respected in such a way that it is safe to surrender an alleged criminal under a treaty.

> It is thought by the court that application to the Secretary of State of the United States will furnish full protection against the delivery of the accused to any government which will not live up to its treaty obligations, and that the Secretary of State will be fully satisfied (before delivering the accused to the demanding government) that he is wanted (in the legal sense of that term) upon a criminal charge, that it is not sought to secure him from a country upon which he is depending as an asylum because of political matters, and that the treaty is not actually used as a subterfuge.

> If adjournment is necessary to allow the accused in this case to investigate the propriety of his extradition, that application should be made to the Department of State, and not to the court. [228 F. at 74 (emphasis added)].

Accord *Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *In re Gonzalez,* 217 F.Supp. 717, 722–23 (S.D.N.Y.1963).

In *Peroff v. Hylton,* 542 F.2d 1247 (4th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977), the Fourth

Circuit Court of Appeals held that an accused may not introduce testimony as to "physical risk he would encounter" if extradited. The court stated:

Finally, Peroff complains that he was not permitted to introduce testimony about the protective agreement and the physical risks he would encounter if actually delivered to the custody of Swedish authorities and transported to Sweden. The protective agreement, however, is simply irrelevant to the question before the court. *If there are potential assassins in Swedish prisons, it is for Sweden to take measures adequate to secure Peroff's safety and protection.* There is no reason to suppose that Sweden cannot do whatever is required to assure Peroff's safety. *A denial of extradition by the Executive may be appropriate when strong humanitarian grounds are present, but such grounds exist only when it appears that, if extradited, the individual will be persecuted, not prosecuted, or subjected to grave injustice.* Such a reason is not present here. There is no basis for suspecting Sweden's criminal processes, or supposing that Sweden cannot or will not adequately provide for Peroff's protection from criminal elements who may have grievances against him. [542 F.2d at 1249 (emphasis added)].

This doctrine of noninquiry was summarized in *In re Sindona,* 450 F.Supp. 672 (S.D.N.Y.1978):

Sindona argues that, even if he is otherwise extraditable, his extradition should be denied because he will not be afforded a fair trial in Italy. Sindona has submitted affidavits offering the opinion that *Sindona is likely to be assassinated upon arrival in Italy and cannot obtain a fair trial.* Sindona has further offered a large body of press excerpts from recent years, to support the theory that the Italian government is unable, and perhaps even unwilling, to exercise sufficient control over its criminal process to provide Sindona with a fair trial.

*The general rule is that an argument of this kind is not properly addressed to the court in the extradition hearing, but must be made to the Department of State, which has the primary responsibility for determining whether the treaties with foreign countries are being properly respected and carried out.* The Department of State has the discretion to deny extradition on humanitarian grounds, if it should appear that it would be unsafe to surrender Sindona to the Italian authorities.... [450 F.Supp. at 694 (emphasis added)].

However, in *Gallina v. Fraser,* 278 F.2d 77 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), the Second Circuit Court of Appeals commented in *dictum* that there might be situations in which the doctrine of noninquiry should be reconsidered.

In *Gallina,* two accuseds who had been convicted *in absentia* in Italy had been certified as extraditable to that state. The *Gallina* court discussed extradition as follows:

*The authority that does exist points clearly to the proposition that the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government.* The right of international extradition is solely the creature of treaty, *Factor v. Laubenheimer,* 1933, 290 U.S. 276, 287, 54 S.Ct. 191 [193], 78 L.Ed. 315. Hence, if the extradition treaty so provides, the United States may surrender a fugitive to be prosecuted for acts which are not crimes within the United States, *Factor v. Laubenheimer, supra,* 290 U.S. [276] at page 300, 54 S.Ct. 191 [at page 198]. We regard it as significant that the procedures which will occur in the demanding country subsequent to extradition were not listed as a matter of a federal court's consideration in *Ornelas v. Ruiz,* 1896, 161 U.S. 502, 508, 16 S.Ct. 689 [691], 40 L.Ed. 787; and we regard it as equally significant that, in refusing to enjoin the Secretary of Defense from turning over an American soldier for prosecution in Japanese courts on charges of having committed crimes on Japanese soil, the

Supreme Court gave no consideration to the procedures that would prevail in the Japanese courts, *Wilson v. Girard,* 1957, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed. 1544. We note that in the field of interstate extradition it would appear that power to impose conditions under which a fugitive is to be surrendered lies solely in the hands of the governor of the asylum state; *Kentucky v. Dennison,* 1860, 24 How. 66, 65 U.S. 66, 16 L.Ed. 717; *Taylor v. Taintor,* 1872, 16 Wall. 366, 83 U.S. 366, 21 L.Ed. 287; *Marbles v. Creecy,* 1909, 215 U.S. 63, 69–70, 30 S.Ct. 32 [33–34], 54 L.Ed. 92; *Sweeney v. Woodall,* 1952, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114, *rehearing denied,* [1953], 344 U.S. 916, 72 S.Ct. 332, 97 L.Ed. 706. Nevertheless, *we confess to some disquiet at this result. We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle set out above.* This is not such a case. There were two convictions *in absentia.* In one relator was, apparently, represented by counsel. In the other relator was tried along with his alleged associates who were present before the court and who were also convicted. We affirm the determination by Judge Smith that the conditions under which relator is to be surrendered to Italy must remain in the hands of the State Department. [278 F.2d at 79 (emphasis added)].

This *dictum* must be understood not as a command to depart from the doctrine of noninquiry but, instead, as a suggestion that, under some situations, the doctrine might be reexamined. *Gallina* was so construed in *Sindona v. Grant,* 619 F.2d 167 (2d Cir.1980):

Appellant also argues that ... his extradition should be denied because return to Italy would subject him to risk of murder or injury at the hands of political enemies on the left. The undated photographs incorporated in the Sindona main brief indicate that the slogan 'a morte Sindona' may have commanded a considerable following among Italian demon-strators. *However, the degree of risk to Sindona's life from extradition is an issue that properly falls within the exclusive purview of the executive branch. See Peroff v. Hylton,* 542 F.2d 1247, 1249 (4 Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977) (executive may deny extradition request but requesting country has primary responsibility for protecting against assassination). As Judge Wisdom has observed:

Review by habeas corpus ... tests only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the executive branch to decide.

*Wacker v. Bisson,* 348 F.2d 602, 606 (5th Cir.1965). Sindona counters that our decision in *Gallina v. Fraser* ... requires the extraditing magistrate to consider whether the circumstances awaiting a fugitive upon extradition would be so egregious as to offend the court's 'sense of decency.' We find no such rule in *Gallina.* That decision denied *habeas corpus* on the strength of established authority holding that the federal courts may not 'inquire into the procedures which await the relator upon extradition,' 278 F.2d at 78. *The fact that Gallina also added the caveat that some situations were imaginable in which a federal court might wish to reexamine the principle of exclusive executive discretion, id. at 79, falls well short of a command to do so here.* In any event, it is apparent that Judge Griesa thoroughly examined the affidavits and exhibits relevant to Sindona's claim. If *Gallina* alone may not have required this much, it follows *a fortiori* that there was no obligation to hold an evidentiary hearing. [619 F.2d at 174–75 (emphasis added) footnote omitted)].

The *Gallina dictum* has been cited favorably, but never applied, by a number of courts. *See Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir. 1983); *United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 928–29 (2d Cir. 1974); *In re Sindona, supra,* 450 F.Supp. at 694–95. It may have been rejected by

the Fourth Circuit Court of Appeals in *Plaster v. United States, supra,* 720 F.2d at 349 & n. 9, the Fifth Circuit Court of Appeals in *Garcia–Guillern v. United States, supra,* 450 F.2d at 1192, and the Seventh Circuit Court of Appeals in *Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). This Court will reexamine the doctrine of noninquiry.[1]

■ In *Eain v. Wilkes, supra,* the Seventh Circuit Court of Appeals rejected the Government's argument that the Executive should decide whether a crime fell within the so-called "Political Offense Exception." The Seventh Circuit's discussion is lengthy, but bears quoting in full:

"The government's argument that the Political Branches should decide the question of whether the crime charged is a 'political offense' under the Treaty has no basis in United States case precedent. The government's contention, however, points up an apparent anomaly in the American law of extradition. *It is the settled rule that it is within the Secretary of State's sole discretion to determine whether or not a country's requisition for extradition is made with a view to try or punish the fugitive for a political crime, i.e., whether the request is a subterfuge. In re Lincoln,* 228 F. 70 (E.D.N.Y.1915), *aff'd per curiam,* 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1916); Note, Executive Discretion in Extradition, 62 Colum.L.Rev. 1313, 1323 (1962). *In contrast, the Judicial branch has consistently determined whether or not the 'political offense' provision applies to the crime charged, presumably relying upon the language in 18 U.S.C. § 3184.* That section requires a hearing to determine whether there is sufficient evidence 'to sustain the charge un-

der the provisions of the proper treaty.' (Emphasis supplied.) We have not found any case where an American court declined to consider the applicability of the political offense exception when it was squarely presented. If anything, one of the major criticisms leveled at American extradition law is that federal courts have tended to invoke the political acts exception in situations of common crimes mixed with political overtones upon a showing of 'any connection, however, feeble' to an uprising or rebellion or condition of domestic violence. *See Garcia–Mora* at 1244; I.A. Shearer, Extradition In International law 171 (1971) (hereinafter referred to as 'Shearer').

"Congress originally made the determination that it is for the courts to decide how to apply the exception by making it a Judicial determination in the first instance as to whether or not the country requesting extradition had charged an individual with a crime 'under the provisions of' a treaty. The Executive branch has, over the years, implicitly endorsed this approach. *The present system of American extradition perhaps may have evolved as a way of providing the Executive some flexibility in decision-making by allowing it to defer to the Judiciary's decision, for example, to refuse extradition of an individual who the Secretary of State is reluctant to extradite anyway.* This 'permits the Executive Branch to remove itself from political and economic sanctions which might result if other nations believe the United States lax in the enforcement of its treaty obligations.' Lubet & Czaczkes, *The Role of the American Judiciary in the Extradition of Political Terrorists,* 71 J.Crim.L. & Criminology 193, 200 (1980) (hereinafter cited as 'Lubet & Czaczkes'). *See Shearer at 192;* Note, *Bringing the*

---

1. Post-*Gallina* decisions suggest that, when an accused's proofs reach a certain level, an evidentiary hearing be conducted. *See Arnbjornsdottir–Mendler v. United States, supra,* 721 F.2d at 683; *Sindona v. Grant, supra,* 619 F.2d at 175. The practical difficulty faced by the Court is that no decision discusses the *quantum* of proof which an accused must produce.

The Court has given careful consideration to the Affidavit of Ajit Singh Bains, which describes numerous instances of alleged miscon-

duct by the Government of India toward Sikhs. The Court expresses no opinion whether that affidavit, together with those portions of the annual reports of Amnesty International for the years 1985, 1986 and 1987, which address conditions in India, would be a sufficient basis to conduct an evidentiary hearing. The Court assumes for the purpose of reexamining the doctrine of noninquiry that a sufficient showing has been made.

*Terrorist to Justice; A Domestic Law Approach,* 11 Cornell Int'l L.J. 71, 74 (1978). With this background in mind, we consider whether the issues involved in applying the political offense exception are such that only the Executive should make the determination.

"The government does not direct our attention to a specific constitutional provision that could be invoked to guide a resolution of this issue which, the government says, does not lend itself to judicial application. See L. Tribe, American Constitutional Law 75 (1978) (hereinafter referred to as 'Tribe'). Instead, the government emphasizes the constitutional commitment of foreign policy and international affairs decisions generally to the Executive, and suggests that the political nature of those areas renders them unsuitable for judicial consideration. But, as the Supreme Court has said, 'it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial competence.' *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). *This court must decide whether the present case contains elements of foreign policy that do lie beyond judicial competence, and if so, whether that justifies a rule that precludes judicial consideration of similar treaty provisions in all cases.*

"We disagree with the government's argument relying on *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710, that construing application of a treaty's political offense exception clause requires 'an initial policy determination of a kind clearly for nonjudicial discretion.' It is clear that courts have authority to construe treaties. See Tribe at 76, n. 35. In the absence of an Executive determination that a treaty has been terminated, a court may consider the issues raised when it is asked to apply the treaty; the court 'can construe [the] treaty and may find it provides the answer.' *Baker v. Carr,* 369 U.S. at 212, 82 S.Ct. at 707. See J. Nowak, R. Rotunda & J.N. Young, Constitutional Law 104 (1978); L. Henkin, Foreign Affairs And The Constitution 210–16 (1972).

"The government stresses the unique resources available to the Executive to aid its determination of the political situation in foreign lands. But the State Department can and has made it a practice to share that information with courts during extradition proceedings. *Cf.* Baldwin, *The Foreign Affairs Advice Privilege,* 1976 Wisconsin L.Rev. 16 (Secretary of State may withhold certain foreign affairs information from Congress). *In extradition proceedings involving the political crime exception, one of the major questions for the magistrate is whether there existed violent political turmoil at the site and time of an individual's alleged illegal activities. The existence of a violent political disturbance is an issue of past fact: either there was demonstrable, violent activity tied to political causes or there was not.* The resources to make that initial determination can ordinarily be sufficiently produced for judicial consideration. *In camera* review is available for sensitive evidence. In this case an assistant legal advisor for the State Department's Office of Combating Terrorism, an authorized spokesman for the Department, did appear and testify. Mr. Fields explained that 'It is the view of the Department of State that indiscriminate use of violence against civilian populations, innocent parties, is a prohibited act, and as such, is a common crime of murder, punishable in both states.' There was additional evidence offered by the Department of State concerning the positions consistently taken by our high government officials in regard to terrorism. The official Executive view was made known to the magistrate. Even though we do not leave sole determination to the Executive branch, we believe its views are entitled to great weight in extradition matters.

*"The government also expresses concern over the possibility that a court's pronouncements on certain subjects may conflict with the Executive's and embarrass this country's conduct of its foreign policy.* In particular, the government points to petitioner's claim that in order to consider the political aspects of his alleged actions a court must 'recognize' the PLO as a legitimate political group, a position the

United States has not taken. We agree with the government when it says '[t]hat decision should only be made by those directly responsible for overseeing our foreign relations.' *However, the formulation of the political offense exception does not require any such 'recognition.' It requires only the recognition that there occurred violent acts and political tensions that resulted in charged criminal acts.* That determination does not give rise to a direct conflict: in most cases there is no real contention about the existence *vel non* of political violence in the requesting country.

"The government's concerns seem directed to whether the Judiciary will recognize a given sort of violence as falling within the protection of the political offense exception, thus implicitly conferring on certain actions a status with which the Executive might disagree. We point out that the Judiciary's conclusions may differ from the Executive's in many areas of law, yet that does not mean that whenever the courts might disagree with the Executive the issue thereby becomes a non-justiciable 'political question.' To some extent, 'all constitutional interpretations have political consequences,' R. Jackson, The Supreme Court In the American System 56 (1955), and indeed the same follows from any treaty interpretation. We recognize the need for special sensitivity in areas such as our government's foreign relations conduct, but that sensitivity does not preclude the Judiciary from having a part in the process of determining whether the political offense exception applies. That determination involves an approach to factfinding that is traditional to the courts.

"We also disagree with the government's argument that there are no judicially discoverable and manageable standards to guide the court's discretion. For better or worse, the extradition statute requires the magistrate to determine that the crime alleged is listed in the applicable treaty, and that the provision of the treaty relating to political offenses does or does not apply. Before an act may constitute a political offense, there must be two basic determination made by the magistrate: that there

was a violent political disturbance in the requesting country at the time of the alleged acts, and that the acts charged against the person whose extradition is sought were recognizably incidental to the disturbance. *The magistrate's legal determination that a person is extraditable does not bind or control the Secretary's later political conclusion. In re Ezeta,* 62 F. 972 (N.D.Cal. 1894). On the other hand, if the magistrate concludes that the individual is not extraditable, it is up to the Secretary to decide whether or not to pursue the issue before another magistrate, as in *In re Gonzalez,* 217 F.Supp. 717 (S.D.N.Y.1963). The Secretary, it appears, contrary to general practice, has been permitted to shop for a more receptive magistrate.

"In order to assure that there is adequate protection of the rights of an individual whose extradition is requested, '[p]urely as a practical matter it would seem reasonable for the courts of this country to make an initial finding of extraditability of particular offenses.' *Shapiro v. Ferrandina,* 478 F.2d 894, 906 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed. 2d 133 (1973). As Judge Friendly stated in the *Shapiro* case, 'we see little reason why a prior judicial determination would be viewed by [the Secretary of State] as an unwarranted intrusion upon executive power.' Ibid. *See* Sharpf, *Judicial Review and the Political Question: A Functional Analysis,* 75 Yale L.J. 517, 584 (1966) (courts are cautious about invoking political question doctrine where important individual rights are at stake). *Cf.* Kutner, *World Habeas Corpus and International Extradition,* 41 U.Toledo L.J. 525, 532 (1964) (Secretary of State's power of ultimate determination not to extradite, despite court certification, shows latitude democracy allows in concern for individual rights).

"The government stresses that courts have refused to look at the requesting country's motives to determine if extradition for a common crime is sought merely as a subterfuge for trying an individual for political crimes, *see Garcia–Guillern v. United States,* 450 F.2d 1189 (5th Cir.1971),

even in the presence of an express provision of the treaty, such as the one in the Treaty before us. *This raises the logical question of why the Executive's authority is 'virtually untrammelled' in that area, but is subject to an initial decision by the Judiciary on the applicability of the political offense exception.*

*"The different approaches taken on political offense and 'subterfuge' issues are not so anomalous as the government suggests.* In considering the presence of a political offense, the court determines whether the crime charged stemmed from political violence. To make that determination, the magistrate need look only to the facts supporting the extradition request for evidence as to whether or not violent political activity was unfolding at the time to which the facts relate, and of the individual's recognizable connection to that violence. *Compared to that, evaluations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion. The Executive's evaluation would look at the actual operation of a government with which this country has on-going, formal relations evidenced by the extradition treaty and imply that the government may be disingenuous. This obviously would be an embarrassing conflict over assumptions essential to our foreign relations about the integrity of governments with which the United States deals. A judicial decision, however, that establishes an American position on the honesty and integrity of a requesting foreign government is distinguishable from a judicial determination that certain events occurred and that specific acts of an individual were or were not connected to those events.* The latter type of decision simply categorizes the facts involved in a given case and then construes the treaty to determine whether or not the facts fall within its ambit. Thus, the Judiciary's deference to the Executive

on the 'subterfuge' question is appropriate since political questions would permeate any judgment on the motivation of a foreign government." [641 F.2d at 513–17 (emphasis added) (footnotes omitted) ].

*Accord In re Mackin*, 668 F.2d 122, 132–37 (2d Cir.1981); *Quinn v. Robinson, supra*, 783 F.2d at 787–90.

Reduced to its essential, *Eain* recognizes that

[a] judicial decision ... that establishes an American position on the honesty and integrity of a requesting foreign government is distinguishable from a judicial determination that certain events occurred and that specific acts of an individual were or were not connected to those events. [641 F.2d at 517].

Were this Court to conduct an evidentiary hearing on the current and future practices of the Government of India and the fate of defendants should they be extradited, it would plainly "establish an American position on the honesty and integrity of a requesting foreign government." Moreover, any judicial determination might embarrass the United States in its foreign relations and do harm to those relations.[2] This is simply unacceptable, as the court concluded in *In re Doherty*, 599 F.Supp. 270 (S.D. N.Y.1984):

Finally, the Court does not accept as dispositive the view expressed by David J. Bentley, Assistant Legal Advisor to the United Kingdom Home Office, which indicates that in England the political offense exception to extradition is now believed to encompass only those situations in which the sovereign has some interest over and above that of enforcing peace and public order in prosecuting an alleged political offender. *See* Tr. at 1232–33, 1245–53. The fact that a sovereign may be neutral in punishing violent conduct designed to achieve political ends does not in itself transform offenses that would otherwise be clearly political in nature into ordinary common law crimes.

---

**2.** "It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

Moreover, *were the Court to accept such a view, it would be placed in the delicate situation of having to assess the neutrality and indirectly the good faith of the sovereign seeking extradition, a circumstance that could adversely affect the conduct of foreign relations and might well be inconsistent with the Treaty's structure, which clearly places such determinations in the hands of the Secretary of State. See In re Mackin,* 668 F.2d 122, 133–34 (2d Cir.1981); *Eain, supra,* 641 F.2d at 513, 516–17. *See also Sindona, supra,* 619 F.2d at 174–76. That possibility is obviously present here where it is certainly at least arguable that the United Kingdom may not be entirely neutral with respect to the issue of Irish independence because it is the end of British rule in Ireland that has been and continues to be the principal objective of the Irish Republican movement. [599 F.Supp. at 277 (emphasis added) (footnote omitted)].

Accordingly, as a matter of law, the Court is satisfied that the doctrine of noninquiry should continue to be applied.

There is another compelling reason for judicial noninquiry. Were the Court to conclude that defendants face "torture and/or murder upon their return to India," the only alternative presumably open to the Court would be to divest itself of jurisdiction over them. *Cf. Demjanjuk v. Petrovsky, supra,* 776 F.2d at 584 (decision to attach conditions to extradition not within discretion of court); *United States v. Toscanino,* 500 F.2d 267, 275 (2d Cir.1974) (court must divest itself of jurisdiction over defendant when acquired as result of "government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional right"). However, were the Secretary to make such a determination, he could nevertheless permit extradition, albeit subject to conditions. *See Demjanjuk v. Petrovsky, supra,* 776 F.2d at 584; *Sin-*

*dona v. Grant, supra,* 619 F.2d at 176; *Shapiro v. Ferrandina,* 478 F.2d 894, 906 (2d Cir.), *cert. denied,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). This Executive power derives from the "doctrine of specialty," *see Shapiro v. Ferrandina, supra,* 478 F.2d at 905, and has been described to enable

the requested state to make the grant of extradition contingent upon agreement regarding procedural or substantive aspects of the trial or punishment. For example, in the case of *Eain v. Wilkes* (*Eain III*), *the Secretary of State agreed to extradite Eain to Israel after receiving assurances that he would receive a public trial in a civilian court, normal rules of criminal procedure would apply, Eain would have counsel of his choice, the prosecution would have to prove guilt beyond a reasonable doubt, if convicted Eain would have a right of appeal, and under no circumstances would he receive the death penalty.* Similarly, in the extradition of Marcos Perez Jimenez, a former President of Venezuela, the court considered carefully which of the murder and embezzlement charges warranted extradition, and concluded that there was only sufficient evidence to sustain extradition for certain of the charged crimes. *The Secretary of State therefore granted the extradition request on the conditions that Jimenez be tried only for these crimes, and that a representative of the United States be allowed to observe the trial.* [Note, 'Extradition in an Era of Terrorism: The Need to Abolish the Political Offense Exception,' 61 *New York University Law Review,* 654, 692 (1986) (emphasis added) (footnotes omitted)].

This flexibility supports lodging in the Secretary, rather than this Court, the question of what treatment awaits defendants should they be extradited.[3]

---

**3.** For example, the Secretary might require that defendants not be detained or brought to trial under the National Security Act, the Terrorist Affected Areas (Special Courts) Act or the Terrorist and Disruptive Activities (Prevention) Acts of 1985 or 1987, that defendants be detained pending trial only in designated facilities in India, that defendants be permitted regular visits by medical personnel while detained pending trial, that defendants be brought to trial within one year of being extradited, and that no further charges be lodged against defendants in India.

Defendants rely on, among other decisions, *Rosado v. Civiletti,* 621 F.2d 1179 (2d Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). In *Rosado,* the Second Circuit Court of Appeals held that federal courts have authority to hear due process claims raised by American citizens held prisoner within the United States but who had been convicted under the laws of Mexico. The citizens contended that their convictions "manifested a shocking insensitivity to their dignity as human beings and were obtained under a criminal process devoid of even a scintilla of rudimentary fairness and decency." 621 F.2d at 1182.

■ In the course of ruling, the court in *Rosado* discussed extradition:

Another useful point of reference is found in cases where a foreign sovereign seeks to extradite an American citizen for trial abroad. Where extradition is sought pursuant to a valid treaty, the Supreme Court has held that the relator cannot prevent his extradition simply by alleging that the criminal process he will receive fails to accord with constitutional guaranties. *See Neely [v. Henkel], supra,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 [ (1901) ]. Since the Constitution bears no relation to crimes committed beyond the jurisdiction of the United States against the laws of a foreign sovereign, a citizen who 'commits a crime in a foreign country cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations.' Id. at 123, 21 S.Ct. at 307. *See also Wilson v. Girard,* 354 U.S. 524, 529, 77 S.Ct. 1409, 1412, 1 L.Ed.2d 1544 (1957) ('sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly ... consents to surrender its jurisdiction'). Thus, where a relator challenges the fairness of foreign process, courts 'are bound by the existence of an extradition treaty to assume that the trial will be fair.' *Glucksman v. Henkel,* 221 U.S.

508, 512, 31 S.Ct. 704, 705, 55 L.E. 830 (1911).

In both *Neely* and *Girard,* however, minimal safeguards to ensure a fair trial in the foreign tribunal were provided. *Neely, supra,* 180 U.S. at 112, 123, 21 S.Ct. at 303, 307; *Wilson, supra,* 354 U.S. at 547, 77 S.Ct. at 1420 (Appendix B). Moreover, this court has previously indicated that the presumption of fairness routinely accorded the criminal process of a foreign sovereign may require closer scrutiny if a relator persuasively demonstrates that extradition would expose him to procedures or punishment 'antipathetic to a federal court's sense of decency.' *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct 97, 5 L.Ed.2d 74 (1960); *United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925 (2d Cir.1974). Finally, to the extent that the United States itself acts to detain a relator pending extradition, it is bound to accord him due process. *See Grin v. Shine,* 187 U.S. 181, 184, 23 S.Ct. 98, 99, 47 L.Ed. 130 (1902); *Gallina, supra,* 278 F.2d at 78. Thus, although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes committed within its territory, it does govern the manner in which the United States may join the effort. *Compare Toscanino, supra,* 500 F.2d 267 *with [United States v.] Lira, supra,* 515 F.2d 68 [ (2d Cir.1975) ] [621 F.2d at 1195–96].

*Rosado* is of no assistance to defendants here for several reasons. First, this Court has rejected the *Gallina dictum.* Second, the decisions of the Supreme Court cited by *Rosado* in support of the proposition that "minimal safeguards to ensure a fair trial in a foreign tribunal were provided," *do not* hold that such safeguards must be afforded as a matter of American constitutional law. Instead, those decisions merely made reference to statutes and treaties conferring certain rights on citizens tried in foreign states. *See Wilson v. Girard,* 354 U.S. 524, 547, 77 S.Ct. 1409, 1419, 1 L.Ed. 1544 (1957) (*per curiam* ); *Neely v. Henkel,* 180 U.S. 109, 112, 21 S.Ct. 302, 303, 45

L.Ed. 448 (1901).[4] As *Rosado* recognized, "where a relator challenges the fairness of foreign process, courts 'are bound by the existence of an extradition treaty to assume the trial will be fair.'" 621 F.2d at 1196 (*quoting Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911)). "It is settled that the petitioner cannot block his extradition simply because the other country's judicial procedures do not comport with the requirements of our constitution." *Plaster v. United States, supra,* 720 F.2d at 349 n. 9.

*Rosado* does describe a well-recognized limitation on the Government. That limitation imposes an obligation on the Government, "in carrying out its treaty obligation, [to] conform its conduct to the requirements of the Constitution." *Plaster v. United States, supra,* 720 F.2d at 348. Thus, the Government may not deliberately offer forged documents as evidence in an extradition proceeding. *See Demjanjuk v. Petrovsky, supra,* 776 F.2d at 577. Defendants here do not challenge any action of the Government. Instead, they challenge the actions of the Government of India.[5]

Defendants also rely on *Grin v. Shine,* 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130 (1902). Defendants quote, in part, the following from *Grin:*

Good faith toward foreign powers, with which we have entered into treaties of extradition, does not require us to surrender persons charged with crime in violation of those well-settled principles of criminal procedure which from time immemorial have characterized Anglo-Saxon jurisprudence. Persons charged with crime in foreign countries, who have taken refuge here, are entitled to the same defences as others accused of crimes within our own jurisdiction. [187 U.S. at 184, 23 S.Ct. at 99].

*Grin* does not hold that evidence should be heard on procedures which may be applied to an accused *after* he is extradited. Instead, *Grin* addressed procedures under which our courts were to determine whether an accused was extraditable. Indeed, the "defects" in the extradition proceeding in issue in *Grin* went to the existence of subject matter jurisdiction, the deficiency of charges against the accused and the nature of the offenses charged, together with the evidence offered against the accused.

The Court finds independent support for its conclusion in *Doherty v. Meese,* 808 F.2d 938 (2d Cir.1986). In *Doherty* the Second Circuit Court of Appeals denied *habeas* relief to a petitioner who had been ordered to be deported to the United Kingdom pursuant to 8 U.S.C. § 1253(a). The court concluded:

*Regarding the second question and assuming Doherty to be a terrorist, the conclusion that the interests of the United States would be prejudiced by Doherty's deportation to the Republic of Ireland cannot be considered unreasonable by a court.* The power granted to the Attorney General by Section 1253(a) allows him, 'in his discretion, [to conclude] that deportation to [the designated] country would be prejudicial to the interests of the United States.' *Such a decision must be based on an analysis of the impact of a particular deportation on United States' interests*

4. *Wilson* did not even arise in the context of an extradition proceeding.

5. In *Prushinowski v. Samples,* 734 F.2d 1016 (4th Cir.1984), the court held that
constitutional questions of deprivation of rights are addressed only to the acts of the United States Government and not to those of a foreign nation, at least for purposes of determining questions of extraditability. [734 F.2d at 1018–19].
However, the court went on to comment that [s]eldom, however, can a principle of law be carried to absolute extremes without developing fissures. It is unlikely that extradition

would be ordered if the facts were established, by assumption for purposes of argument, or by convincing proof, that the prisons of a foreign country regularly opened each day's proceedings with a hundred lashes applied to the back of each prisoner who did not deny his or her God or conducted routine breakings on the wheel for every prisoner. [734 F.2d at 1019].
Although not clear from the opinion, the text of one footnote appears to suggest that it would be for the Secretary not to order extradition. *See* 734 F.2d at 1019 n. 2.

*viewed as a whole by a politically responsible official.* There are no statutory guidelines regarding what quality or quantity of prejudice to United States interests is necessary, or even what constitutes 'interests.' *The requisite judgment requires an essentially political determination. This is underlined by the fact that such a judgment inevitably affects United States relations with other nations.* As the Supreme Court has held,

> any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952) (footnote omitted); *see also Bertrand v. Sava,* 684 F.2d 204, 211–12 (2d Cir.1982).

The interests of the United States at issue in the present matter demonstrate the nexus between the Attorney General's discretion under Section 1253(a) and the conduct of foreign relations. *The decision whether to deport Doherty affects not only the relations of the United States with the United Kingdom and the Republic of Ireland, but also the complicated multilateral negotiations concerning efforts to halt international terrorism.* The pertinent portion of Section 1253(a) is 'drawn so that a court would have no meaningful standard against which to judge [the Attorney General's] exercise of discretion.' *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). [808 F.2d at 943 (emphasis added)].

As the decision of the Attorney General before the court in *Doherty* required an "essentially political determination," so does the decision sought by defendants here, which requires that the current and future practices of a foreign state be determined.

For the reasons set forth above, defendants may not offer evidence that they will be denied a fair trial should they be extradited, or that they face "torture and/or murder upon their return to India." The Government of India may not be put on trial in this extradition proceeding.

SO ORDERED.